NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0682n.06

Nos. 14-6555/6556

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 08, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RITA CHRISTINE WHICKER; | ) | COURT FOR THE EASTERN |
| RUTH THOMASINE ROBINSON | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |

**OPINION**

BEFORE: MERRITT, McKEAGUE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Rita Christine Whicker and Ruth Thomasine Robinson (collectively, Defendants) appeal their convictions of aiding and abetting aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), asserting that the district court erred by precluding them from arguing that the victim's consent to the use of his identity is a defense to aggravated identity theft. Defendants also challenge the loss calculation and forfeiture judgment, asserting that the district court erred by not offsetting these amounts by the value of services actually provided. We **AFFIRM**.

**I.**

In 2006, Ginger Halbert (Halbert) began to volunteer for the City of Martin, Kentucky. Whicker, Halbert's childhood friend, was at that time the office manager for the Housing

Authority of Martin and also oversaw the Martin Community Center. Robinson, the mayor of Martin during the relevant time period, is Whicker's mother.

The Government presented evidence that after Halbert had volunteered for a short period of time, Whicker, Robinson, and Halbert decided to compensate Halbert for her work. Halbert had been receiving Social Security disability benefits since 2000 as the result of a car accident. To allow Halbert to continue to receive those benefits, the group agreed that paychecks would be issued to Halbert's son, Jeremy Pack (Pack), rather than Halbert. Whicker prepared fraudulent employment contracts between Pack and the city to document that Pack worked as an after-school tutor, which Halbert signed in Pack's name. City officials issued paychecks in Pack's name from August 2007 through December 2012, which Halbert endorsed using Pack's name and cashed. Pack did not work for the city during this period, with the possible exception of one summer in 2006 or 2007 when he worked at the Martin Community Center in the children's summer program. Halbert's work for the city included answering phones for Robinson, running errands, and preparing for parades.

The majority of the paychecks, totaling $62,614.61, were issued from the Martin Community Center. These payments were funded from grants from the U.S. Department of Housing and Urban Development (HUD), through a Resident Operating Self-Sufficiency (ROSS) grant, earmarked for the community center's afterschool program and related expenses. The Housing Authority of Martin received the ROSS grant funds and transferred those funds to the Martin Community Center. This money was not authorized for the city's general operating expenses or to pay staff at city hall. The remainder of the checks to Pack, totaling $36,500.20, were issued by the City of Martin. During the period Halbert was working for the city, she received $77,834.90 in Social Security disability benefits.

A grand jury returned an indictment charging Halbert, Whicker, and Robinson[1] with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (count one); five counts of fraud, conversion, or intentional misapplication of government funds in violation of 18 U.S.C. § 666(a)(1)(A) (counts two through six); one count of receiving stolen Social Security benefits in violation of 18 U.S.C. § 641 (count seven); and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (count nine). Counts seven and nine charged Whicker and Robinson with aiding and abetting Halbert. In addition, Halbert was charged with one count of concealing earned income with intent to fraudulently secure Social Security benefits in violation of 42 U.S.C. § 408(a)(4) (count eight). The indictment also sought forfeiture.

Halbert pleaded guilty to counts one, six, and nine, in exchange for the Government's agreement to dismiss the other six counts and not prosecute Pack.

Prior to trial, the Government filed a motion in limine to preclude Defendants from arguing that Pack's consent to the use of his identity is a complete defense to the aggravated identity-theft charge. Defendants opposed this motion but consented to the district court's pre-trial order precluding Defendants from raising this legal argument in their opening statements or at any other point during trial without permission from the district court. During trial, the district court granted the Government's motion in limine, explaining that "§ 1028A applies even in 'cases where the defendant obtained the permission of the person whose information the defendant misused,'" and ordering that "[t]o the extent the defendants lacked lawful authority to use Pack's name, they may not make the legal argument that Pack's alleged consent is a defense

---

[1] The indictment also charged Ethel Lee Clouse (Clouse), the city clerk who prepared the checks, with counts one, seven, and nine. At trial, the district court granted the Government's motion to dismiss all charges against Clouse.

to the charged offense under 18 U.S.C. § 1028A(a)(1)." (R. 84: Minute Order, PID 252 (quoting *United States v. Lumbard*, 706 F.3d 716, 725 (6th Cir. 2013)).)

Pack testified at trial that FBI agents initially contacted him in 2013, while he was at the University of Kentucky. Before the agents discussed anything with Pack, they allowed him to call his mother, Halbert, at his request. On that phone call, Halbert told Pack to lie to the FBI agents and say that Pack worked in the afterschool program pursuant to a labor contract he had with the city until January 2013, and that Halbert only volunteered for the city. Pack obliged initially and told the agents that he had given his mother permission to sign the checks in his name, even though in reality he was not aware of any labor contracts and had no knowledge that checks were being issued and signed in his name. Approximately six months later, Pack met with the Government again and said that he had not been working for the City of Martin and that he had never given Halbert permission to sign his name to the checks. He was aware, however, that Halbert was working for the city and that Halbert was depositing money into his account.

Pack also explained that in 2006 or 2007 Halbert told him she was receiving checks in his name from the city, and that Pack therefore could not get a job with the city. After he persisted in seeking a job, Halbert told Pack that she would quit so he could get a job, which he did. Pack, therefore, believed Halbert had stopped receiving checks in his name. In addition, Halbert assured Pack at a later time when he was preparing financial-aid forms for college that the check scheme had stopped.

The jury found Defendants guilty of counts one through seven and nine. At sentencing, the Government sought to include $176,949.71 in the loss calculation, restitution order, and forfeiture judgment, which was comprised of funds paid to Halbert in Pack's name by the City of Martin ($36,500.20); ROSS grant funds paid by the Martin Community Center to Halbert in

Pack's name ($62,614.61); and Social Security disability benefits received by Halbert ($77,834.90). Defendants objected to inclusion of the first two sums, arguing that these amounts should be offset by the value of Halbert's work for the city and that the Government failed to prove that Halbert's work would have been excluded under the ROSS grants. The district court overruled Defendants' objections.

Based on a loss amount of more than $120,000 but less than $200,000, the district court applied a ten-level increase to Defendants' base offense levels and sentenced Robinson and Whicker to 57 months imprisonment and 45 months imprisonment, respectively.[2] The district court also ordered restitution and forfeiture in the amount of $176,949.71, for which Defendants were held jointly and severally liable with co-defendant Halbert.

This appeal followed.

## II.

Defendants first argue that the district court erred in granting the Government's motion in limine precluding them from making the legal argument that Pack's consent to the use of his identity is a defense to the aggravated identity-theft charge pursuant to 18 U.S.C. § 1028A(a)(1). The parties disagree on the appropriate standard of review. Although we ordinarily review a district court's ruling on a motion in limine for abuse of discretion, *United States v. Gunter*, 551 F.3d 472, 483 (6th Cir. 2009), the issue here is one of law requiring de novo review, *United States v. Lumbard*, 706 F.3d 716, 720 (6th Cir. 2013); *see also Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) (explaining that in criminal cases courts often consider non-evidentiary matters through motions in limine even though a motion in limine is defined as a motion to exclude anticipated prejudicial evidence before the evidence is offered).

---

[2] Robinson was sentenced to an additional 33 months imprisonment to run consecutively to the 57-month term of imprisonment imposed here, for a total sentence of 90 months, due to a conviction in another case not at issue on this appeal.

The "Aggravated identity theft" provision, 18 U.S.C. § 1028A(a)(1), states that "[w]hoever, during and in relation to" a violation of 18 U.S.C. § 641 or certain other statutes "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." Citing legislative history and the Supreme Court's decision in *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), Defendants assert that they should have been able to argue that if Pack consented to Halbert's use of his identity, as he initially informed FBI agents, Defendants were not operating without lawful authority. Defendants also observe that the statute is titled "Aggravated identify theft" and argue that no theft could have occurred if Pack consented.

In *United States v. Lumbard*, 706 F.3d 716 (6th Cir. 2013), we considered and rejected the same argument Defendants make here. In *Lumbard*, the defendant had agreed to purchase a driver's license, birth certificate, and social security number from a man who resembled him. *Id.* at 719. When it came time to make the purchase, however, the man instead provided the defendant with his date of birth, place of birth, social security number, and identifying information about his parents, which the defendant used to obtain a U.S. passport and flee the country. *Id.* Upon his capture and extradition, a grand jury indicted the defendant for violating 18 U.S.C. § 1028A and other crimes. *Id.* at 720. After the district court denied his motion to dismiss the count of aggravated identity theft, the defendant pleaded guilty but reserved his right to appeal the district court's denial of his motion to dismiss. *Id.* On appeal, the defendant argued he should not have been convicted of 18 U.S.C. § 1028A(a)(1) because "the phrase 'without lawful authority' excludes cases, such as this one, where a defendant obtains a person's consent to use his or her information unlawfully." *Id.* at 721. Thus, the defendant in *Lumbard*

urged us to "take the section title 'Aggravated Identity Theft' literally and read the statute to require actual theft." *Id.*

We rejected that argument after analyzing *Flores-Figueroa* and the legislative history of the statute—the same sources Defendants rely on here. We explained that *Flores-Figueroa* "analyzed § 1028A to determine the *mens rea* required for commission of the offense, which is not at issue here," and that "[t]he Court's focus on fraud versus theft is instructive, but not determinative." *Id.* at 722. We also noted that the Supreme Court had determined the legislative history was inconclusive, and we further found that the legislative history "suggests at least a secondary focus beyond simply protecting victims of identity theft." *Id.* at 724.

Accordingly, observing that the plain meaning of "lawful" is not limited to "permission," we concluded "that the phrase 'without lawful authority' in § 1028A is not limited to instances of theft, but includes cases where the defendant obtained the permission of the person whose information the defendant misused." *Id.* at 723, 725; *see also id.* at 725 (noting that "six other circuits to hear this issue have concluded that § 1028A extends beyond mere theft"). *But see United States v. Spears,* 729 F.3d 753, 758 (7th Cir. 2013) (en banc) ("Section 1028A, we hold, uses 'another person' to refer to a person who did not consent to the use of the 'means of identification.'").

Defendants have not offered any reason why our prior decision in *Lumbard* does not control this case. Indeed, Defendants raise the same arguments and cite the same materials that we considered and rejected in *Lumbard*. Because we cannot overrule a prior published panel decision, *see* 6 Cir. R. 32.1(b), we find no error in the district court's ruling.

**III.**

Defendants next challenge the district court's refusal to offset the loss amount and the amount of the forfeiture judgment by the value of services Halbert provided.[3]

"We review the district court's calculation of the 'amount of loss' for clear error, but consider the methodology behind it de novo." *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). We review a district court's interpretation of the federal forfeiture laws de novo, the district court's findings of fact for clear error, and whether those facts are sufficient to constitute a proper criminal forfeiture de novo. *United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001).

**A. Loss Calculation**

In imposing a sentencing enhancement based on actual loss under U.S.S.G. § 2B1.1, the district court determines under a preponderance of the evidence standard "the reasonably foreseeable pecuniary harm that resulted from the offense," which means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013); U.S.S.G. 2B1.1 cmt. n.3(A)(i), (iv). "[T]he district court need not be exacting," as "[t]he Guidelines require only a 'reasonable' estimate of actual or intended loss within broad ranges." *United States v. Howley*, 707 F.3d 575, 583 (6th Cir. 2013) (quoting U.S.S.G. 2B1.1 cmt. n.3(C)). The

---

[3] In the conclusion of their briefs, Defendants request that we "reverse the restitution and forfeiture Order" of the district court. (Appellants' Br. 25-26.) Because Defendants do not mention restitution until the conclusion of their brief and do not cite a single case or statute addressing restitution, we construe their appeal as challenging the district court's loss calculation in determining a sentencing enhancement, as well as challenging the amount of the forfeiture judgment. This is consistent with Defendants' objections to their PSRs and the issues they raised at sentencing. To the extent Defendants did intend to appeal the restitution order, that argument is waived. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996))).

district court should then reduce that loss by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. 2B1.1 cmt. n.3(E)(i).

The district court applied a ten-level increase to Defendants' base offense levels after concluding that the loss amount was between $120,000 and $200,000. Defendants do not contest that the Social Security disability benefits paid to Halbert while she was working for the city, amounting to $77,834.90, were properly included in the district court's loss calculation. Defendants contend, however, that the $62,614.61 in ROSS grant funds paid to Halbert in Pack's name by the Martin Community Center and the $36,500.20 in funds paid to Halbert in Pack's name by the City of Martin were not properly included because Halbert actually performed the work for which she was paid. Accordingly, Defendants appear to argue that the value of Halbert's services should offset the loss amount calculated by the district court.

For the federal ROSS grant funds, the evidence showed that these funds were specifically designated for an afterschool program and related expenses and were not allowed to be used for general operating expenses of the city or to pay staff at city hall. We agree with the district court that because HUD granted these funds for a specific purpose, a misapplication of those funds for an unintended purpose constitutes a loss to HUD. *See* U.S.S.G. §2B1.1 cmt. n.3(F)(ii) ("In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be."); *United States v. Newell*, 658 F.3d 1, 30 (1st Cir. 2011) ("If the federal agencies were harmed, it was not by losing possession of the funds—these were, after all, *grants*—but rather by not having the funds go to the designated

programs."); *United States v. Cicco*, 938 F.2d 441, 445 (3d Cir. 1991) ("The Senate Report [to 18 U.S.C. § 666] expressly notes that Congress wished the new statutory provision to be interpreted 'consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud and undue influence by bribery.'" (quoting S. Rep. 98-225 at 370, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3511)).

Defendants do not dispute that HUD would have suffered losses of $62,614.61 if the funds were indeed used to pay for services not specified by the grants, but argue instead that Halbert was involved in the roles for which the ROSS grant funds were allocated. In support, Defendants point out that Halbert served as a board member for the Housing Authority of Martin. But there is nothing in the record to indicate that a board member for the Housing Authority would be involved with the afterschool program for which the funds were intended. Indeed, Halbert only testified that her work duties (for which she was publicly held out as a volunteer) involved answering phones, running errands, and preparing for city parades. The Government presented unrebutted evidence that the ROSS grant funds could not be used to pay for Halbert's stated work activities. Accordingly, we find no error in the district court including in its loss calculation the $62,614.61 in ROSS grant funds paid to Halbert in Pack's name.

Defendants also contend that the district court erred by including in its loss calculation the $36,500.20 in funds paid by the City of Martin. Defendants do not challenge the amount of the fraudulent payments Halbert received from the City of Martin. Rather, they argue that this amount should be offset by the value of services Halbert actually performed. Relying on *United States v. Washington*, 715 F.3d 975 (6th Cir. 2013), the district court found that the Government met its burden by proving how much the city paid Halbert in Pack's name as a result of

Defendants' fraudulent scheme, but Defendants failed to demonstrate the value of services provided by Halbert to offset the loss.

In *Washington*, Detroit Public Schools (DPS) paid the defendant and her company, A4L, $3.32 million to create a wellness program for DPS's employees. 715 F.3d at 977-78. A4L completed some work for DPS, but also engaged in several fraudulent practices, including billing for work not yet performed and providing kickbacks to a DPS insider who helped ensure the invoices were paid. *Id.* at 980. DPS eventually instructed A4L to stop work and initiated a criminal investigation. *Id.* at 978. The defendant was convicted of conspiracy to commit program fraud, in violation of 18 U.S.C. §§ 371 and 666, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956. *Id.* at 978-79. In affirming the district court's loss calculation of at least $2.5 million, we rejected the defendant's argument that the district court should have reduced the loss further based on the value of the work performed:

> Washington does not explain how the court could have made a more detailed calculation of the value of work performed, given that A4L did not keep records of hours or work completed. The government met its burden to prove that DPS paid $3.32 million to A4L. Counsel for Washington admitted during oral argument that Washington had the burden of proving the specific value by which that amount should be reduced. We agree. . . . Washington provided no estimates of the value of the work completed other than the hourly rates in the invoices that were found to be fraudulent. As a result, the district court was justified in making an estimate based on available information. Indeed, it would have been justified in finding the amount of loss to be the entire $3.32 million because it found that the entire wellness program was a sham.

*Id.* at 984-85.

Consistent with *Washington*, Defendants do not dispute that the Government met its burden by proving that payments were made in the amount of $36,500.20 by the City of Martin to Jeremy Pack—who did not work for the city—as a result of Defendants' fraudulent scheme. Nor do they cite any evidence in the record to quantify the value of Halbert's work or explain how the district court could have made a calculation of the value of the work performed to offset

the loss amount. At trial, Halbert testified that she did not keep track of her hours.[4] Although Halbert testified that she was paid a salary, she did not say what that salary was or how it was determined, and was not able to explain why many checks varied substantially in amount. Under these circumstances, we cannot conclude that the district court clearly erred by including the full $36,500.20 in funds from the City of Martin in its loss calculation.

Further, inclusion of the $36,500.20 paid by the city does not affect the ten-level sentencing enhancement because the ROSS grant funds and unauthorized Social Security disability benefits paid to Halbert total more than $120,000 in losses.

## B. Forfeiture Judgment

Defendants next dispute the amount of the forfeiture judgment based on the same arguments addressed above. "Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" or conspiracy to violate 18 U.S.C. §§ 641, 666, among other crimes, is subject to forfeiture. *See* 18 U.S.C. § 981(a)(1)(C) (incorporating 18 U.S.C. § 1956(c)). The Government concedes that this is a case involving lawful services provided in an illegal matter, and therefore "the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B). While the Government bears the burden to prove the amount of money acquired through the illegal transactions, Defendants bear the burden of proof "with respect to the issue of direct costs." *Id.*; *see also United States v. Mandell*, 752 F.3d 544, 553-54 (2d. Cir. 2014).

Defendants do not dispute that the district court's calculation of the forfeiture amount accurately represents the amount of money acquired through the illegal transactions. Rather,

---

[4] Clouse testified that Halbert volunteered for the city every day but did not know her precise hours.

Defendants contend only that Halbert performed the work for which she was paid. Similar to the district court's loss calculation, because Defendants failed to show the value of any direct costs incurred in providing the services, the district court did not clearly err in declining to reduce the amount of the forfeiture judgment.

**IV.**

For these reasons, we **AFFIRM**.

**MERRITT, Circuit Judge, dissenting.** I would send this case back for resentencing because of the gross disparity between the sentences the main culprit, Ginger Halbert, received (24 months' imprisonment) and the two co-conspirators, Whicker and Robinson, who received much longer sentences. Halbert and her son initiated the fraud against the United States government and received all of the fraudulent money. The other two aided Halbert, their friend, by allowing her to receive the money; but they profited not at all. It seems likely that the two much less culpable defendants will have to pay back all of the money ($177,000) because the most culpable defendant, Halbert, may be judgment-proof. The law makes all three jointly liable. It seems completely unfair to me to impose a sentence twice as severe on the least culpable. Therefore, I would remand with instructions to reduce the sentences for Whicker and Robinson to a level equivalent with their degree of culpability in the overall scheme. The whole purpose of the Sentencing Guidelines was to get rid of these kinds of gross disparities. The Sentencing Reform Act itself, as well as the Introduction to the Guidelines, both condemn this form of gross sentencing disparity. The Introduction in paragraph 3 states the policy against such "disparities" as this and the need for "proportionality" based on culpability. In addition, 18 U.S.C. § 3553(a)(6) calls attention to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." I view the sentencing disparity in this case between Halbert and Whicker and Robinson as unwarranted. Based on the record on appeal, it seems obvious that the much longer sentence for the least culpable should be significantly reduced, and I hope that the government would be amenable to considering a reduction in the sentences that Whicker and Robinson received.