**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

  v.

KEVIN W. WILLIAMS,
     *Defendant-Appellant.*

No. 11-30118

DC No.
CR 09-5465

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, Senior District Judge, Presiding

Argued and Submitted
April 12, 2012—Seattle, Washington

Filed September 7, 2012

Before: Procter Hug, Jr., A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima

**COUNSEL**

David Reese Jennings and Aravind Swaminathan (argued), Assistant United States Attorneys, Seattle, Washington, for the plaintiff-appellee.

Phil Brennan, Seattle, Washington, for the defendant-appellant.

**OPINION**

TASHIMA, Circuit Judge:

Defendant-Appellant Kevin Williams appeals his jury conviction and sentence for three counts of wire fraud, two counts of possession of an unregistered firearm, and one count each of extortion, making a false statement, destruction of a letter box, and possession of a firearm not identified by a serial number. Williams contends that the district court erred in grouping his offenses for purposes of sentencing and in applying five sentencing enhancements. We affirm the district court's imposition of two of the sentencing enhancements at issue, but otherwise vacate Williams' sentence and remand for resentencing.[1]

---

[1]In a memorandum disposition filed concurrently with this opinion, we address Williams' remaining contentions and affirm his conviction.

## I. FACTUAL BACKGROUND

In 2006, the FBI began investigating an Atlanta-based Ponzi scheme known as the International Management Associates ("IMA") fraud. The approximately 300 victims of the scheme lost a total of $86 million. Kirk Wright was the principal defendant in the federal prosecution that followed. Bill Perkins was appointed by the Securities and Exchange Commission as receiver for IMA's assets and an investors' committee, made up of the seven largest IMA investors, was formed to represent the fraud victims. Mark Kaufman was appointed as counsel for the investors' committee.

In July 2007, Williams began calling Kaufman, Perkins, and FBI Special Agent William Cromer, who was investigating the case. Williams told them that he was a private investigator, and that he had been doing his own investigation into the IMA fraud, and he asked for payment for his information. At no point did Williams provide any evidence that he possessed any relevant information. During this time, Williams lived in Chehalis, Washington. State records show that Williams never reported income as an investigator and no payments were made to him by others for such services. His bank accounts also did not reflect any expenses for investigative work. In August 2007, he changed the name of his bank account to the "E.F.E. Foundation." His telephone answering machine also included a message explaining that the E.F.E. Foundation specialized in fundraising and investigative work.

Williams' housemate, Dean Hanson, testified that in October 2007, Williams decided to blow up his own mailbox in order to bolster his efforts to get a share of the IMA money. Williams built a pipe bomb and set it off on October 21. At Williams' direction, Hanson cleaned up and disposed of the bomb's parts and called the sheriff to report the bombing. Melissa Nacht, Hanson's girlfriend, testified that Williams staged the explosion so that "Agent Cromer would think that other people believed Mr. Williams about having this infor-

mation and would take him more seriously." During the ensuing investigation of the bombing, Williams provided a recorded statement to Postal Inspectors in which he said that the explosion occurred when he reached his hand into the mailbox to collect mail and that the bombing probably occurred because of his private investigation work on an Atlanta fraud case.

Postal Inspector Rod Stephens later explained that the Postal Service was "extremely nervous" about the mailbox bombing; local postmasters were worried about sending their letter carriers out to deliver mail because they feared harm, which could damage the integrity of the mail system. On October 24, 2007, Postal Inspectors and ATF Agents visited Williams' residence to investigate the bombing, accompanied by a dog trained to detect explosives. When the investigators arrived at his house, Williams greeted them with an assault rifle in his hands. Alarmed, Postal Inspector Stephens asked him if he had any other weapons. Williams responded by listing his firearms, including one he described as a "zip gun." Williams' use of that term caught Stephens' attention, because a zip gun is a homemade pen or flashlight gun that is concealable and well-known to be illegal. The investigators received Williams' consent to enter his house and retrieved a fully-assembled zip gun with ammunition attached to its container.

In October 2007, Kaufman received another phone call from Williams, in which Williams told him that people were "hounding" him and listening in on his communications. Kaufman thought that Williams was trying to convey that his information was of value. On January 22, 2008, Williams sent an email to Steve Atwater, a member of the investors' committee, asking for $172,000 in exchange for Williams' information. Atwater forwarded the message to the rest of the committee.

On January 24, 2008, Williams sent an email to Kaufman and the members of the investors' committee, as well as a

number of other individuals working on the IMA case. In the email, which included many typographical errors, Williams introduced himself as the owner of an investigative company and wrote that he had investigated the IMA case for two years and across six states. He implied that he had information indicating that individuals other than Kirk Wright were involved in hiding the IMA money and mentioned that his mailbox had been blown up by someone who was scared of his information.

Ryan O'Neal, a member of the investors' committee, emailed Williams in January to express his interest in Williams' information. Williams replied, explaining that he had spent 2400 hours of his time and over $69,000 investigating the IMA case. The two began communicating by phone; Williams asked O'Neal for $250,000 in payment and O'Neal offered to meet Williams at the Portland airport to discuss Williams' information. When they met at the airport, Williams described to O'Neal a conspiracy theory that people close to the IMA case were hiding the missing money. Williams showed O'Neal an accounts payable ledger, which O'Neal's lawyer subsequently determined was not indicative of any conspiracy.

On February 9, 2008, Williams sent O'Neal another email. The email, which included a number of typographical errors and expletives, expressed frustration that he had not yet been paid for his investigation and again mentioned the mailbox bomb as evidence that "obviously I have what somebody else wants." He asked O'Neal to wire $250,000 to an account in order for the E.F.E. Foundation to begin releasing its information. He closed the email by stating that as of February 12, his investigation would stop and his "distributing" would begin. Williams followed up with another email on February 10, full of misspellings and foul language, railing against O'Neal as untrustworthy and closing by saying, "Here at the E.F.E., the right people love us, the right people respect us, and the right people fear us." Williams wrote again on February 11, stating

that if O'Neal had trusted E.F.E. from the beginning, "we would both already have our money."

On February 18, 2008, Williams emailed the investors' committee. He claimed that the government and other individuals involved with the investigation, including attorneys and members of the committee, already had Williams' information about the IMA fraud and were covering it up. He wrote that he had been shot, that his mailbox had been blown up, and that he was getting calls from a computer-generated voice at night. He complained that all he had ever asked for were his expenses back. He closed the email with expletive-filled invective, stating, "I wont [sic] wait for karma to come to you, I'll be bringing it to you my-self immediately. So you all better start paying attention to everything around you because hell is soon to be in full session." A number of the recipients of this email took it to be a threat of physical harm.

In late April 2008, Williams drove to Atlanta to attend Kirk Wright's trial. Williams was arrested at the federal courthouse and a search of his van revealed guns, ammunition, blasting caps, other explosives, a copy of the Anarchist Cookbook on a floppy disk, and a walking cane altered to be used as a firearm. Williams pled guilty to firearms charges in the Northern District of Georgia in August of 2008 and was sentenced to probation.

## II. PROCEDURAL BACKGROUND

In a Superseding Indictment returned June 17, 2010, in the Western District of Washington, Williams was charged with: Counts 1-3, wire fraud, in violation of 18 U.S.C. § 1343, based on the emails Williams sent on January 24, February 9, and February 18; Count 4, transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(b), based on the February 18 email; Count 5, possession of an unregistered firearm (the mailbox pipe bomb), in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; Count 6, destruction

of a letter box, in violation of 18 U.S.C. § 1705; Count 7, making a false official statement, in violation of 18 U.S.C. § 1001; Count 8, possession of an unregistered firearm (the zip gun), in violation of §§ 5861(d) and 5871; and Count 9, possession of a firearm without a serial number (the zip gun), in violation of §§ 5861(i) and 5871. Williams was tried before a jury and found guilty on all nine counts.

The district court sentenced Williams to 96 months' imprisonment. Following the recommendations in the Pre-Sentence Investigation Report ("PSR"), it grouped Williams' offenses into two groups: (1) Counts 1 through 7; and (2) Counts 8 and 9. The PSR recommended that Counts 1 through 7, which included the convictions for wire fraud, extortion, possession of the pipe bomb used to blow up the mailbox, destruction of a letter box, and the false statement made in connection with the mailbox explosion, be grouped together because they represented "a common scheme." Counts 8 and 9, the two zip gun convictions, were grouped together in the PSR because they were unrelated to the extortion scheme, but were related to each other. The district judge stated at sentencing that he agreed with the PSR's grouping, because "[t]his whole mailbox blowing up business was a part of the fraud charges. I don't think you can properly separate that out by time or anything else in the way that the defense has suggested." The district court also applied a number of sentencing enhancements discussed in further detail below. Williams timely appealed his conviction and sentence.

## III.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We review de novo the district court's decisions regarding the grouping of convictions for purposes of sentencing. *United States v. Melchor-Zaragoza*, 351 F.3d 925, 927 (9th Cir. 2003). We review the district court's interpretation of the Sentencing Guidelines de novo, its application of the Guidelines to the facts for abuse of discretion, and its factual

findings for clear error. *United States v. Franco-Flores*, 558 F.3d 978, 980 (9th Cir. 2009) (quoting *United States v. Alvarez-Hernandez*, 478 F.3d 1060, 1063 (9th Cir. 2007)).

## IV.   DISCUSSION

### A.   Grouping of Charges

[1] U.S.S.G. § 3D1.2 provides that for purposes of sentencing, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." Williams contends that Counts 1 through 4, the wire fraud and extortion charges, should be grouped together and that Counts 5 through 7, the charges related to the mailbox bombing, should be grouped separately. The government argues that Counts 1 through 7 involve "substantially the same harm" because they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b).[2] Williams responds that the victims of his mailbox-related offenses and his wire fraud and extortion offenses were distinct, and so the counts should not have been grouped together. We agree.

---

[2]At oral argument, the government raised the new contention that U.S.S.G. § 3D1.2(c) could justify the district court's decision to group Counts 1 through 7 together for sentencing purposes. That section provides that counts should be grouped together "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." Because the government failed to raise this contention until oral argument, Williams was not provided "a fair opportunity to respond comprehensively to [the] claim" and this Court was deprived "of the benefit of a robust debate informed by zealous advocacy." *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). We therefore find the new argument waived, although the Government is free to reargue its merits before the district court on remand. *See United States v. Riley*, 335 F.3d 919, 930 n.6 (9th Cir. 2003).

**[2]** As Williams correctly points out, to satisfy the requirements of § 3D1.2(b), it is not enough that Counts 1 through 7 were all part of a single scheme to defraud. We must instead specifically consider whether the fraud, extortion, and mailbox explosion counts all represent one common scheme *with the same victim*. *See United States v. Boos*, 127 F.3d 1207, 1209-13 (9th Cir. 1997) (holding that even though there was a common scheme to distribute child pornography, there was not a single common victim because multiple girls were depicted and so grouping was not appropriate). Neither the PSR nor the district court examined this question.

**[3]** Application Note 2 to § 3D1.2 explains:

> The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (*e.g.* drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsection (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related.

Note 2 further states that ambiguities should be resolved in accordance with the purpose of § 3D1.2, which is to identify counts involving substantially the same harm. We conclude that the interest most directly damaged by Williams' letter box explosion was the societal interest in protecting the integrity of the mail system. Accordingly, the primary harm of the mailbox incident was to local law enforcement, the Postal Service, and residents of Williams' town who were placed in fear because of the bombing.

The statute criminalizing malicious destruction of a letter box, 18 U.S.C. § 1705, supports this conclusion. *See Boos*,

127 F.3d at 1210-11 (considering which individual or group Congress thought to be the primary victim protected by statutes criminalizing distribution of child pornography). When a letter box is designated an "authorized depository" of the mail, "it becomes an essential part of the Postal Service's nationwide system for the delivery and receipt of mail," and that letter box is provided with "the protection of the federal statutes prohibiting the damaging or destruction of mail deposited therein." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 123, 128 (1981). Section 1705 is therefore primarily designed to protect the integrity of the postal system, in society's general interest.

**[4]** It is undoubtedly true that the IMA investors were ultimately also victims of Williams' decision to blow up his own mailbox; he mentioned the destruction of his mailbox a number of times in his emails to the investors in an attempt to bolster his claim that he was in possession of vital information. The Guidelines specifically provide, however, that indirect or secondary victims are not meant to be included in the term "victim" under § 3D1.2(b). Williams did not mention the mailbox bombing to the IMA investors until three months after it took place, although he clearly had his fraudulent scheme in mind when he planned the explosion.

**[5]** The effect of the bombing on the community of Chehalis, Washington, was much more immediate. Section 3D1.2(b) is intended to capture and group "counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim." § 3D1.2 cmt. n.4. In this case, there was a significant and distinct additional harm to the community of Chehalis that would be unaccounted for in Williams' sentence if his mailbox offenses were grouped with his extortion and fraud offenses. Accordingly, we conclude that the IMA investors can only be considered indirect or secondary victims of the mailbox bombing.

**[6]** Similarly, the primary victim of Williams' possession of a pipe bomb and his false statement is society in general, rather than the IMA investors, who were only indirectly affected by Williams' acts at his home in Washington. *See United States v. Gastelum-Almeida*, 298 F.3d 1167, 1175 (9th Cir. 2002) (determining that false statement statutes protect a societal interest in the provision of truthful information to law enforcement); *United States v. Nanthanseng*, 221 F.3d 1082, 1084 (9th Cir. 2000) (explaining that the societal interest most directly threatened by the possession of firearms is preventing the loss of personal safety resulting from the violent physical assaults that are facilitated by the proliferation of unregistered weapons).

**[7]** As a result, the primary victim of the mailbox-related charges, society in general, was distinct from the primary victim of the extortion and wire fraud charges, the IMA investors, even though all of the acts were ultimately linked as part of Williams' common scheme to defraud the IMA investors. We therefore reverse the district court's decision to group Counts 1 through 7 together and remand for regrouping and resentencing.

## B.  Sentencing Enhancements

Williams appeals five sentencing enhancements imposed by the district court. We conclude that three of these enhancements were imposed in error and remand for recalculation of Williams' sentencing range.

### 1.  *Enhancement Under U.S.S.G. § 2B3.2(b)(1)*

Williams first challenges a two-level enhancement that the district court imposed under U.S.S.G. § 2B3.2(b)(1). Williams' base offense level for his first group of offenses (Counts 1-7) was determined by § 2B3.2, which deals with offenses of extortion by force, threat of force, or serious damage. Section 2B3.2(b)(1) provides for an increase of two

levels if the offense "involved an express or implied threat of death, bodily injury, or kidnapping[.]" Williams argues that because § 875(b) already only applies to extortion based on threats of injury or kidnapping, the district court's application of the § 2B3.2(b)(1) enhancement constituted improper double counting. He also argues that there was insufficient proof that he threatened specific harm to any recipient of his February 18 email.

   "Double counting" occurs where the Guidelines use the same conduct more than once to increase the severity of a sentence. *United States v. Parker*, 136 F.3d 653, 654 (9th Cir. 1998). As this court explained in *United States v. Reese*:

> [T]he use of a single aspect of conduct both to determine the applicable offense guideline and to increase the base offense level mandated thereby will constitute impermissible double counting only where, absent such conduct, it is impossible to come within that guideline. If, on the other hand, it is possible to be sentenced under a particular offense guideline without having engaged in a certain sort of behavior, such behavior may be used to enhance the offense level, for in this situation, the guideline's base offense level will not necessarily have been set to capture the full extent of the wrongfulness of such behavior.

2 F.3d 870, 895 (9th Cir. 1993). The latter situation exactly describes the circumstances in this case. As Application Note 2 makes clear, § 2B3.2 applies if there was any threat that reasonably could be interpreted as one to injure a person *or* physically damage property, or any comparably serious threat. Section 2B3.2 is thus applicable to crimes such as 18 U.S.C. § 1030(a)(7) (threats to impair the operation of a computer), which do not require any threat of bodily injury or kidnapping. As a result, Williams' double counting claim fails.

**[8]** Furthermore, there was certainly sufficient evidence to apply the § 2B3.2(b)(1) enhancement in Williams' case, because Jury Instruction 18 specifically required that the jury find there was a threat made with the intent of placing a person in fear of bodily harm or death. Because the jury found Williams guilty of a § 875(b) offense, the district court was justified in relying on its findings in applying the § 2B3.2(b)(1) enhancement.

### 2. *Enhancement Under U.S.S.G. § 2B3.2(b)(2)*

**[9]** Williams also contends that the district court erred in applying the sentencing enhancement provided for in § 2B3.2(b)(2), which allows for an increase in sentence if the amount demanded as a part of the extortion crime exceeds a given amount. The district court found that it was established beyond a reasonable doubt that the defendant had demanded more than $50,000 from IMA investors. This factual finding was not clearly erroneous. The government's evidence showed that Williams had asked O'Neal for $250,000 on many occasions and had asked Atwater for $172,000 before he made his threat in the February 18 email. The district court therefore did not err in applying this enhancement based on the amount of money Williams demanded.

### 3. *Firearm Enhancement Under U.S.S.G. § 2B3.2(b)(3)(iii)*

Section 2B3.2(b)(3)(iii) provides for a five level enhancement "if a firearm was brandished or possessed[.]" The district court applied this enhancement to the extortion offense because the government proved that Williams possessed a destructive device and other guns at the time he destroyed his mailbox. Williams argues that there was no evidence that he possessed a firearm at the time he sent the extortionate email and so the § 2B3.2(b)(3)(iii) enhancement does not apply.

In determining offense characteristics and adjustments, the district court can take into account both the offense of convic-

tion and all "relevant conduct," as defined in U.S.S.G. § 1B1.3. The particular offense of conviction being considered by the district court in applying the firearm enhancement was extortion, because it provided the baseline offense level. Because no firearm was used during the transmission of the extortionate email, in order to determine if the district court appropriately applied the firearm enhancement, we must consider whether the mailbox bombing constitutes "relevant conduct" to the extortion offense under § 1B1.3.

Relevant conduct includes, inter alia, all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]" § 1B1.3(a)(1)(A). The mailbox bombing took place months before the extortionate email was sent, and so cannot be characterized as occurring *during* the commission of the offense of extortion. The key question, then, is whether the mailbox bombing occurred "in preparation for" the extortion offense.

**[10]** We conclude that it did not. Williams bombed his mailbox in order to convince the IMA victims that he had valuable information, and so the mailbox bombing was likely committed "in preparation" for his fraud offenses. But there is no indication that in October of 2007, Williams was already preparing to threaten the IMA investors' committee as he did in his February 18, 2008, email. Williams' destruction of his own mailbox did nothing to bolster the credibility of his extortionate threat and so cannot be considered to have been committed in preparation for that offense. The mailbox bombing is thus not "relevant conduct" under § 1B1.3 and cannot be considered for purposes of enhancing Williams' extortion sentence. As a result, the district court erred in enhancing Williams' sentence based on the use of a firearm.

#### 4.   *Leadership Adjustment Under U.S.S.G. § 3B1.1(c)*

**[11]** The district court enhanced Williams' sentence for extortion pursuant to U.S.S.G. § 3B1.1(c) because the court determined that it had been proven beyond a reasonable doubt that Williams was the leader of a group of three people at the time of the mailbox bombing. For the same reasons laid out above, the mailbox offense was not "relevant conduct" for purposes of sentencing for extortion and so cannot be taken into account in determining whether Williams was eligible to receive a leadership enhancement for his extortion offense. The district court's decision to enhance Williams' sentence based on his leadership role was therefore also in error.

#### 5.   *Obstruction of Justice Adjustment*

The district court added a two-point adjustment to Williams' extortion sentence because he was convicted of making a false statement to law enforcement. U.S.S.G. § 3C1.1 allows such an enhancement if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing "of the instant offense of conviction" or if the obstructive conduct related to the offense of conviction, any relevant conduct, or a closely related offense, such as that of a co-defendant.

**[12]** For the same reasons laid out above, Williams' false statements made in connection with the mailbox explosion are not part of the instant offense of conviction, extortion, and are not "relevant conduct." *See also United States v. Ford*, 989 F.2d 347, 352 (9th Cir. 1993) ("[T]he language of section 3C1.1 does not encompass any and all obstructive conduct that a defendant may have attempted or committed, but instead applies only to willful attempts to obstruct or impede the administration of justice [in relation to] the instant offense.") (internal quotation marks omitted). The district

court's imposition of an obstruction enhancement was therefore also in error.

## V. CONCLUSION

For the foregoing reasons, we vacate Williams' sentence and remand for regrouping and resentencing in conformity with this opinion.

**Sentence VACATED and REMANDED.**