# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 19-3761

———————————————

United States of America

*Plaintiff - Appellee*

v.

Rossi Lorathio Adams, II, also known as Rossi Adams, also known as Polo

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

——————————

Submitted: January 13, 2021
Filed: April 30, 2021

——————————

Before GRUENDER, BENTON, and STRAS, Circuit Judges.

——————————

GRUENDER, Circuit Judge.

Rossi Lorathio Adams, II was tried and convicted of conspiracy to interfere with commerce by threats and violence, *see* 18 U.S.C. § 1951, and he was sentenced to 168 months' imprisonment. On appeal, he challenges the district court's denial of his *Batson* objection, its admission of certain evidence, its orders requiring him to pay certain costs and attorney fees, and its calculation of his advisory sentencing

guidelines range.  We affirm except for that part of the district court's order taxing costs for grand jury witnesses, which we reverse.

**I.**

Adams was an internet entrepreneur and social-media influencer.  Around 2015, Adams founded State Snaps, LLC, which he operated on various social-media platforms including Snapchat, Instagram, and Twitter.  On these platforms, State Snaps displayed content submitted by its social-media followers, which often consisted of explicit photographs and videos.  In their images and videos, State Snaps' followers began including the phrase "Do It For State," which went "viral."

To further his business, Adams sought to acquire the doitforstate.com internet domain and "doitforstate" trademark.  Through internet-domain registrars such as GoDaddy.com, individuals may register, buy, sell, and transfer internet domains.  The registration of a domain name grants the holder an exclusive, transferable right to own a particular internet address.  After determining that Ethan Deyo ("Ethan") already owned the doitforstate.com internet domain, Adams arrived unannounced at Ethan's home in Cedar Rapids, Iowa, and asked to buy it.  Ethan did not sell him the domain at that time but indicated he would follow up.

Adams also learned that Brandon Miller, an acquaintance of Ethan, was using a "DoItForState" hashtag to promote concerts and other events around the country.  Upon learning of Miller's use of the hashtag, Adams contacted Miller by text message and insisted that he stop using it.  When Miller refused, Adams sent Miller a text message containing gun emojis.

Subsequently, Ethan, his brother Chris Deyo ("Chris"), and Miller met with Adams at a local restaurant to discuss a partnership and sale of the doitforstate.com domain, but the negotiations were unsuccessful.  Afterward, Adams repeatedly returned unannounced to Ethan's home, trying to convince Ethan to sell him the domain name, but Adams was repeatedly rebuffed.

Eventually, Adams recruited his cousin, Sherman Hopkins, Jr., to break into Ethan's home and force Ethan to transfer the doitforstate.com domain to Adams. Hopkins was a homeless felon with a lengthy criminal history that included at least one violent crime.

Adams drove Hopkins to Ethan's neighborhood several times, showing Hopkins where Ethan lived and conducting surveillance. Then, on June 21, 2017, Adams picked up Hopkins and dropped him off behind Ethan's residence. Hopkins was armed with a taser, which Adams provided, and a firearm, which Hopkins provided but which he displayed in Adams's presence in the car. Hopkins also carried a demand note that Adams had provided, which described how to transfer the domain to Adams's GoDaddy account. Adams planned to wait at a nearby Walgreens while Hopkins forced Ethan to transfer the doitforstate.com domain name to Adams, and once the transfer was confirmed, Adams would return to pick up Hopkins.

After being dropped off, Hopkins entered Ethan's residence, found and confronted Ethan, forcibly moved him to his home office, ordered him to turn on his computer, and showed him the demand note. While Ethan attempted the transfer, Hopkins tased him several times and struck him repeatedly with the firearm. As the transfer was processing, Hopkins cocked his firearm and threatened to "blow [Ethan's] . . . head off" if the transfer was not done correctly. Ethan then tried to wrestle the firearm away from Hopkins, at which point it discharged and shot Ethan in the right leg. Ethan eventually gained control over the weapon and called 911. After medical personnel arrived, Ethan declined pain medication, stating that he was "fine," and he said he did not wish to go to the hospital. But he eventually agreed to go after the medical personnel encouraged him to do so. At the hospital, he was treated for the gunshot wound in his right leg and a laceration above his left eye. He was discharged after approximately two and a half hours.

The next day, Adams called GoDaddy several times to ask for assistance with his account (the same account indicated on the demand note), indicating that he was supposed to be getting a domain transferred to his account from another GoDaddy customer but did not see that the domain transfer had occurred. Some time later, investigators examined the demand note and found Adams's left palm print on it.

A grand jury returned a one-count indictment against Adams, charging him with conspiracy to interfere with commerce by threats and violence. *See* 18 U.S.C. § 1951. During jury selection, the Government used a peremptory strike against the only black prospective juror. Adams raised a *Batson* objection to this, which the district court rejected. During trial, the district court admitted over Adams's objection Miller's testimony about a video in which Adams told his followers to send pictures to Miller's phone, which Miller alleged caused his phone to "crash[]."

After a four-day trial, the jury found Adams guilty. At sentencing, the district court applied a seven-level increase to Adams's offense level pursuant to U.S.S.G. § 2B3.2(b)(3)(A)(i) because the offense involved discharge of a firearm; a four-level increase pursuant to § 2B3.2(b)(4)(B) because the offense resulted in a victim's serious bodily injury; and a two-level increase pursuant to § 2B3.2(b)(1) because the offense involved an express or implied threat of death, bodily injury, or kidnapping. The district court then determined that Adams had a total offense level of 35 and a criminal-history category of I, yielding an advisory sentencing guidelines range of 168 to 210 months' imprisonment. It ultimately sentenced Adams to 168 months' imprisonment. The court also found that Adams had earned a significant amount of money since committing the crime and therefore ordered Adams to pay $22,000 in court-appointed attorney fees and $3,957.45 in prosecution costs.

Adams appeals, challenging the district court's denial of his *Batson* objection, its admission of Miller's testimony, its order requiring him to pay certain prosecution costs, its order requiring him to pay $22,000 in attorney fees, and its calculation of his offense level.

## II.

Adams first claims that he is entitled to a new trial because the Government violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by striking the only black prospective juror. Adams argues that the district court clearly erred in finding that the Government did not purposely discriminate against the black prospective juror. He also contends that the district court failed to complete the third step of the *Batson* analysis and failed to determine whether the prosecutor's explanation of the strike was reasonable or improbable, which he argues is required under *Miller-El v. Cockrell*, 537 U.S. 322 (2003). We review for clear error the district court's finding that the Government's peremptory strike of a black prospective juror was not "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi*, 588 U.S. ---, 139 S. Ct. 2228, 2244 (2019). Because Adams did not raise before the district court his argument that the district court failed to complete the third step of the *Batson* analysis or his argument regarding *Miller-El*, we review these claims for plain error. *See Hopson v. Frederickson*, 961 F.2d 1374, 1377-78 (8th Cir. 1992).

The Equal Protection Clause of the Fourteenth Amendment prohibits striking a juror when the strike is "motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2238, 2244. *Batson* requires a three-step, burden-shifting analysis to evaluate a defendant's objection to the strike of a juror based on race. *United States v. Jones*, 245 F.3d 990, 992 (8th Cir. 2001). First, the opponent of a peremptory strike must make a *prima facie* case of racial discrimination. *Id.* Second, if the *prima facie* case is made, the burden of production shifts to the proponent of the strike, who must offer a race-neutral explanation. *Id.* Third, if a race-neutral explanation is presented, the district court must determine whether the opponent of the strike has proven purposeful racial discrimination, typically by demonstrating that the government's reasons are pretextual. *Id.* at 992-93.

Only one member of the jury venire was black. The Government used its first peremptory strike to remove that prospective juror, which Adams objected to under *Batson*. The Government then provided four reasons for striking the prospective

juror:  (1) he had a recent conviction for marijuana possession; (2) he was unemployed; (3) he lived with his parents; and (4) when questioned about prior jury service mentioned on his jury questionnaire, he explained that he did not actually serve on the jury but had been dismissed.  After Adams explained his dispute with the Government's rationale, the district court overruled the *Batson* objection, finding that the Government's reasons for striking the juror were race-neutral and that Adams had not shown these reasons were pretextual.

Adams argues that this was clear error.  He claims that the Government's proffered reasons for striking the black prospective juror were pretextual because they were unreasonable, because white prospective jurors were treated differently, and because two of the Government's four proffered reasons were factually incorrect.

In determining whether the proffered reason for a strike is the actual reason or a pretext for race, we often look to whether jurors of other races with the same characteristics were struck.  *See Flowers*, 139 S. Ct. at 2235; *Devoil-El v. Groose*, 160 F.3d 1184, 1187 (8th Cir. 1998).  We also consider whether we previously "have found similar reasons to be sufficiently race-neutral to withstand a *Batson* challenge." *Devoil-El*, 160 F.3d at 1186-87.  Here, it is undisputed that two of the Government's four reasons for striking the black juror were factually correct:  the juror's prior conviction for marijuana possession and his unemployed status.  Adams does not claim that any white prospective juror both had a prior conviction and was unemployed.  *See id.* at 1187 (finding no pretext where "the combination of characteristics was different in the non-stricken venirepersons" than in the stricken venirepersons); *United States v. Baker*, 205 F.3d 1347, 1999 WL 1144835, at *1 (8th Cir. 1999) (per curiam) (unpublished table decision) (finding no pretext when a "black venireperson was removed for a combination of reasons not attributable to any of the nonchallenged venirepersons").  Additionally, we have previously found similar reasons to be sufficiently race-neutral to withstand a *Batson* challenge.  *See Devoil-El*, 160 F.3d at 1186-87 (upholding strike based in part on unemployed status); *United States v. Wilcox*, 487 F.3d 1163, 1170 (8th Cir. 2007) (upholding

strike based on prior criminal conviction). Thus, we conclude that the district court did not clearly err in finding that the Government's reasons were not pretextual.

Second, Adams argues that the district court plainly erred because it did not conduct the third step of the *Batson* analysis and, even if it did, it erred by failing to state whether the prosecutor's explanation of the strike was reasonable or improbable, which he claims is required by *Miller-El*, 537 U.S. at 339. But *Miller-El* does not impose such a requirement. Rather, it speaks to what a court may consider in determining whether a defendant "has proved purposeful discrimination at step three" of the *Batson* analysis. *Id*. at 338-39. Though *Miller-El* explains that a prosecutor's credibility may be measured by his "demeanor," by "how reasonable" or "how improbable" his explanations are, and "whether [his] proffered rationale has some basis in accepted trial strategy," it does not require a court to make explicitly these factual findings. *See id*. at 339. Indeed, we do not even require district courts to make an explicit factual finding that no discrimination has been shown because the denial of a *Batson* objection "is itself a finding at *Batson*'s third step that the defendant failed to carry his burden of establishing . . . purposeful discrimination." *Edwards v. Roper*, 688 F.3d 449, 457 (8th Cir. 2012) (brackets omitted). Here, the district court found that the Government's reasons were not pretextual and denied the *Batson* objection. Thus, the district court did not plainly err in failing to address the third step of the *Batson* analysis and did not plainly err by failing to make additional, more specific findings on the record.

## III.

Next, Adams argues that the district court prejudicially abused its discretion by admitting testimony from Miller that Adams alleges is hearsay. "We review a district court's evidentiary decisions under an abuse of discretion standard, but even if the district court erred in admitting the evidence, we will not reverse if the admission of the evidence was harmless." *United States v. Walker*, 393 F.3d 842, 848 (8th Cir. 2005) (internal quotation marks, brackets, and footnote omitted); *see*

*also* Fed. R. Crim. P. 52(a). Here, we need not reach whether the admitted testimony was inadmissible hearsay because its admission was harmless.

At trial, the Government called Miller as a witness. Miller is an event promoter who was using "Do It For State" as a hashtag in his promotional materials. In March 2015, Adams contacted Miller and asked him to stop using the hashtag, but Miller continued to use it. At trial, Miller testified over Adams's objection that (1) after he continued using the hashtag, he received "like a thousand messages through [his] phone" from Adams's social-media followers, which "crashed" his phone, and (2) Adams had placed a video on Adams's social-media account asking his followers to send such messages to Miller.

"An evidentiary error is harmless when, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." *United States v. Love*, 521 F.3d 1007, 1009 (8th Cir. 2008). Here, admission of this testimony did not affect the verdict because the testimony concerned a collateral issue. *See Ball v. Wyrick*, 547 F.2d 78, 80 (8th Cir. 1977). Adams's conviction was for conspiring to force Ethan to transfer the doitforstate.com domain to Adams, not for his statements toward Miller. There was overwhelming evidence of Adams's role in Hopkins's violent attempt to force Ethan to transfer the domain to Adams. Not only did Hopkins testify that Adams was the mastermind behind the scheme, but Adams's left palm print was found on the demand note. In addition, the day after the home invasion, Adams called GoDaddy several times and made statements implicating his involvement in the home invasion. Because there was overwhelming evidence that Adams committed the crime of conspiracy to interfere with commerce by threats and violence, Miller's testimony regarding this collateral issue did not affect Adams's substantial rights and did not have more than a slight influence on the verdict. Accordingly, any error was harmless.

# IV.

Adams next argues that the district court wrongly ordered him to pay prosecution costs that included the costs of witnesses who testified before the grand jury and the costs related to a Government witness's attendance at trial when that witness did not testify. We review an award of costs for an abuse of discretion. *United States v. Hiland*, 909 F.2d 1114, 1142 (8th Cir. 1990). However, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

"Under 28 U.S.C. § 1918(b), the district court has the discretionary authority to tax the 'costs of prosecution' against the defendant in any non-capital case." *Hiland*, 909 F.2d at 1141 (footnote omitted). "Absent explicit statutory or contractual authorization to the contrary, federal district courts may tax as costs only those expenses listed in [28 U.S.C.] § 1920." *Id*. at 1142.

Adams first argues that the district court abused its discretion by assessing costs for witnesses who testified before the grand jury because those costs are not taxable against him. We agree. Section 1920 "does not include the costs of investigation leading to indictment." *Id.*; *see also Biggerstaff v. United States*, 260 F. 926, 927 (8th Cir. 1919) (suggesting that "prosecution" does not begin until the grand jury returns an indictment because, "[u]ntil [then,] there is no case or cause against the accused to be prosecuted"). These costs were not "costs of prosecution" and thus were not taxable against Adams, so we reverse the part of the district court's order imposing them.

Adams also argues that the district court abused its discretion in assessing costs for witness K.G., who attended but did not testify at trial. We disagree. Generally, "in order for fees to be taxable for witnesses who appear voluntarily and who are not called to testify, it must be shown that their testimony is material." *Spiritwood Grain Co. v. N. Pac. Ry. Co.*, 179 F.2d 338, 344 (8th Cir. 1950). Because they do not testify, "there is a rebuttable presumption that their testimony is not

material." *Id.* "The presumption is overcome, however, if it appears that an order of court or other circumstance rendered their testimony unnecessary." *Id.*; *see also Stanley v. Cottrell, Inc.*, 784 F.3d 454, 467 (8th Cir. 2015).

K.G. was a GoDaddy employee whose testimony the Government needed in order to lay the foundation for the admission of certain GoDaddy business records. Before trial, Adams's counsel agreed to stipulate to the admissibility of the GoDaddy business records on the condition that the Government call K.G. as a witness so that he could cross-examine her. Thus, K.G.'s testimony was material. The reason that K.G. did not testify was because, upon Adams's request, the Government agreed to allow Adams to put on a witness during the Government's case-in-chief, which gave the Government less time to present the witnesses it intended to present that day. When it became clear that there would no longer be enough time for the Government to call K.G. that day, the Government told the district court that it would allow K.G. to leave, and Adams did not object. The Government's attempted accommodation of Adams's out-of-order witness and Adams's failure to object to the Government's allowing K.G. to leave constituted a "circumstance [that] rendered [K.G.'s] testimony unnecessary." *See Spiritwood*, 179 F.2d at 344. Therefore, the district court did not abuse its discretion in assessing witness costs for K.G.

## V.

Adams also argues that the district court erred in ordering him to reimburse the government $22,000 in attorney fees (a little less than half of the total attorney fees incurred on his behalf) after determining that Adams was able to pay for his court-appointed attorney. Adams asserts that, under 18 U.S.C. § 3006A(d)(2), the maximum amount a court-appointed attorney could claim in fees at the time of his trial was $11,500. This argument presents a question of statutory interpretation, which we consider *de novo*. *See Lochridge v. Lindsey Mgmt. Co.*, 824 F.3d 780, 782 (8th Cir. 2016).

District courts must have in place a plan for "furnishing representation for any person financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a). "A person for whom counsel is appointed shall be represented at every stage of the proceedings," but "[i]f at any time after the appointment of counsel . . . the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel or authorize payment as provided in [§ 3006A(f)], as the interests of justice may dictate." *Id.* § 3006A(c). In turn, § 3006A(f) provides that "[w]henever . . . the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney . . . or to the court . . . as a reimbursement."

In this case, the district court found that Adams had the financial resources to reimburse the government for part of the costs of his court-appointed attorney. Adams does not dispute this finding, but he argues that the amount he must reimburse is capped by § 3006A(d)(2). His reliance on § 3006A(d)(2) is misplaced, however, as that section does not limit how much a nonindigent defendant such as Adams must reimburse the government for his own defense. Nothing in § 3006A(c) or (f), which apply here and permit a court to order reimbursement, limits such reimbursement to the maximum amount referenced in § 3006A(d)(2). *See, e.g.*, *United States v. Lefkowitz*, 125 F.3d 608, 621 (8th Cir. 1997) (upholding a district court order that a defendant reimburse the government $316,693.70 for the costs of his defense because "[s]uch an order is expressly authorized by 18 U.S.C. § 3006A(f)"). In fact, the court itself may, in some circumstances, award attorney fees beyond the maximum amounts described in § 3006A(d)(1)-(2). *See* 18 U.S.C. § 3006A(d)(3) (permitting the court to waive the maximum amounts in § 3006A(d)(1)-(2) for extended or complex representation). The statute does not limit reimbursement of attorney fees by a nonindigent defendant. *Id.* § 3006A(c), (f); *see also Lefkowitz*, 125 F.3d at 621; *United States v. Konrad*, 730 F.3d 343, 351-52 (3d Cir. 2013) (upholding a district court's order that a defendant pay the costs of his defense because he could afford it and refusing to limit reimbursement to the

"court-appointed counsel" rates). Therefore, we affirm the district court's assessment of attorney fees.

## VI.

Finally, Adams claims that the district court procedurally erred in imposing offense-level increases under U.S.S.G. § 2B3.2(b)(3)(A)(i), (4)(B), and (1) when calculating his total offense level. "In reviewing a sentence for significant procedural error, we review a district court's factual findings for clear error and its interpretation and application of the guidelines de novo." *United States v. Marshall*, 891 F.3d 716, 719 (8th Cir. 2018) (per curiam).

## A.

Section 2B3.2(b)(3)(A)(i) authorizes a seven-level increase to a defendant's offense level "[i]f a firearm was discharged" as part of the offense. "[I]n the case of a jointly undertaken criminal activity," the court may consider "all acts and omissions of others that were . . . reasonably foreseeable in connection with that criminal activity" in calculating the defendant's sentence. *See* § 1B1.3(a)(1)(B)(iii). Here, the district court imposed a seven-level increase because it found that Hopkins discharged a firearm during the course of the offense and that this was reasonably foreseeable to Adams. Adams argues that Hopkins's discharge of the firearm was not reasonably foreseeable to him.

"Relevant to a determination of reasonable foreseeability is whether or to what extent a defendant benefitted from his co-conspirator's activities." *United States v. Flores*, 73 F.3d 826, 833 (8th Cir. 1996). "An additional relevant factor is whether the defendant demonstrated a substantial level of commitment to the conspiracy." *Id*. The district court found both factors present here. As it found, Hopkins entered Ethan's home at Adams's instruction to force Ethan to transfer the doitforstate.com domain name to Adams. It found that Adams's attempts to obtain the domain name "increased in vehemency" over time and that he was the orchestrator of the offense.

Additionally, the district court found that Adams was aware of Hopkins's violent criminal history, that he saw Hopkins with the firearm before he entered Ethan's home, and that he "intended" violence be used to force Ethan to comply. The district court relied on these facts to find that Hopkins's discharge of the firearm was reasonably foreseeable to Adams.

Each of these facts finds ample support in the trial record, and the district court did not clearly err in finding them. In light of these facts, the district court did not err in concluding that Hopkins's discharge of the firearm was reasonably foreseeable so as to trigger the seven-level increase under § 2B3.2(b)(3)(A)(i). *See, e.g.*, § 1B1.3 cmt. n.4(B)(i) (stating that a "getaway driver in an armed bank robbery" would be responsible for an assault on a bank teller because the assault was "within the scope and in furtherance of the jointly undertaken criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense)").[1]

B.

Section 2B3.2(b)(4)(B) authorizes a four-level increase to the defendant's offense level if a victim of the offense sustained "serious bodily injury." A "serious bodily injury" is an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." § 1B1.1, cmt. n.1(M). The district court imposed this four-level increase because it found that Ethan's gunshot wound was a "serious bodily injury." Adams disputes this conclusion.

We agree with the district court that Ethan's gunshot wound constitutes a "serious bodily injury" within the meaning of § 2B3.2(b)(4)(B). This injury required

---

[1]The grounds for Adams's two other increases discussed below—that a victim sustained serious bodily injury and that the offense involved a threat of death, bodily injury, or kidnapping—were reasonably foreseeable to Adams for the same reasons.

medical intervention—Ethan was hospitalized for approximately two and a half hours while being treated, including receiving stitches. Adams counters that this hospital stay was not long enough to constitute "hospitalization." Even if Adams is correct, "hospitalization" is only one example of "medical intervention." If this hospital stay was too short to constitute "hospitalization," the gunshot wound still required medical intervention. Therefore, it constitutes a "serious bodily injury" under § 2B3.2(b)(4)(B). *See, e.g.*, *United States v. Mason*, 5 F.3d 532, 1993 WL 335764, at *1 (8th Cir. Sept. 7, 1993) (per curiam) (unpublished table decision) (concluding that a wound to the victim's head from being struck with one of the defendant's revolvers was a "serious bodily injury" under the guidelines, even though the victim initially refused medical attention and only went to the emergency room the next morning, because the wound "was 'quite deep,' was bleeding significantly, and required stitches"). The district court thus did not err in concluding Ethan's gunshot wound was a "serious bodily injury," triggering a four-level increase under § 2B3.2(b)(4)(B).

C.

Lastly, Adams claims the district court erred when it imposed a two-level increase under § 2B3.2(b)(1) for committing an "offense involv[ing] an express or implied threat of death, bodily injury, or kidnapping" because this two-level increase is also an element of the offense and therefore "baked in" to the base offense level.

Adams's contention is essentially a double-counting objection. "Double-counting at sentencing occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Bryant*, 913 F.3d 783, 787 (8th Cir. 2019) (internal quotation marks omitted). "[A] court impermissibly double-counts when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways" unless "the Sentencing Commission so intended and each guideline section furthers an independent purpose of sentencing." *Id*. (internal quotation marks omitted).

-14-

Here, no double counting occurred because the increase takes account of a harm that is not fully accounted for by the base offense in the sentencing guidelines or the statute of conviction. The base offense, U.S.S.G. § 2B3.2, does not require threats of death, bodily injury, or kidnapping. *See* U.S.S.G. § 2B3.2 cmt. n.2 (explaining that this guideline applies to threats that are not threats of physical injury to a person); *see also United States v. Williams*, 693 F.3d 1067, 1074 (9th Cir. 2012) (holding that the base offense does not require the behavior necessary to qualify for the increase). Neither does the statute of conviction. *See* 18 U.S.C. § 1951(a), (b)(2) (prohibiting, among other things, extortion, which includes "obtaining the property of another . . . by wrongful use of . . . fear"); *see also United States v. Jones*, 997 F.2d 967, 969 (1st Cir. 1993) (holding that 18 U.S.C. § 1951 "criminalizes a wide array of fear-producing threats" and does not require a "threat of bodily harm"). But the increase in § 2B3.2(b)(1) does. Therefore, no double counting occurred. *See Williams*, 693 F.3d at 1074 (holding that there is no double counting when a court applies the base offense under § 2B3.2 and the increase under § 2B3.2(b)(1) because the base offense does not require the behavior necessary to qualify for the increase); *Jones*, 997 F.2d at 969 (holding that the district court did not err in applying the increase under § 2B3.2(b)(1) when the same threat factored into the base offense level and 18 U.S.C. § 1951 was the statute of conviction). Therefore, the district court did not err by applying the increase in § 2B3.2(b)(1).[2]

---

[2]To the extent Adams claims that § 3A1.3's cmt. n.2 prevents a court from imposing both the base offense level in § 2B3.2(a) and the increase in § 2B3.2(b)(1), his argument has no merit, as § 3A1.3's cmt. n.2 does not apply to § 2B3.2. In addition, Adams's claim that *United States v. Werlinger*, 894 F.2d 1015 (8th Cir. 1990), compels a different result is incorrect. *Werlinger* held that when the basis for one increase was the same as the basis for another, it was double counting to apply both. *Id.* at 1016-19. Adams argues that this implies that when the basis for an increase is also necessary for the base offense, it is double counting to apply the increase. Even if Adams is right, however, the basis for the § 2B3.2(b)(1) increase that the district court applied here is not necessary for Adams's base offense as we have discussed.

## VII.

For the foregoing reasons, we reverse that portion of the district court's order taxing costs for grand jury witnesses, but as to every other issue Adams raises on appeal, we affirm.

———————————————